Alright, last case this morning is Tafas v. Dudas. Mr. Tupin, when you're ready. May it please the Court, the Court below erred by failing to begin by examining the statutory delegation of rulemaking authority to the PTO. All of the regulations at issue here fit squarely within the plain meaning of governing the conduct of proceedings before the office and seek to expedite the process of patent applications. As this Court has held in Lacovara and Bender, the PTO's interpretation of Section 2 is entitled to Chevron deference. In Stevens v. Tamai and other cases the Court has erred. Well, that's kind of the issue, isn't it? Whether there's Chevron deference here, whether this is substantive, procedural? Well, the first question the Court should ask is whether they concern governing the conduct of proceedings before the office. In a case like Merck, it did not concern proceedings before the office and therefore the issue of substantive versus procedure within the statutory delegation was not an issue. How would you define, give us a working definition as to your view of what constitutes something that is entailed within the notion of proceedings before the office, as used in 2B? Let me give some examples from the Court's precedents. Well, okay, but none of the precedents really get to this kind of case, it seems to me. First, all of these concern the timing and nature of the presentation of information and claims to the office during the course of its proceedings. So those squarely fit within the definition. Even under APA jurisprudence in cases like JVM and ANOVA, the D.C. Circuit and the Fourth Circuit have said where— In other cases, the fact that procedure may have an impact on outcome does not make it substantive. In fact, in the CCPA's decision— It's just procedure, I'm going to say, everyone with the last name of Bryson may not file an application for any invention at the Patent and Trademark Office. Solely procedural. Doesn't that seem to get a little substantive at some point? The question then, Your Honor, should be whether it's in accordance with law. And on that issue, the question then goes to the substantive provision and whether the agency's interpretation of the substantive provision is entitled to Chevron doffice. But on the question of whether the rule itself is ultra-virus, that's like beyond the agency's capability, that's a question which would be on governing the conduct of proceedings. In the Van Ornum case, for example, that concern whether one could avoid a double-patenting rejection by filing a terminal disclaimer if the patent had been assigned to someone else. That clearly directly affected an outcome, and yet the Court held that that was within the rulemaking authority of the PTO. Similarly, the Rubenfield case— But getting back to your point, you want Chevron deference, but you only get that deference if you're acting within the scope of your authority, and that's a matter on which there is no deference, right? Under Bender and Lacovara, the Court accorded the agency Chevron deference with respect to— Under Borlam, we said very clearly, only if you're within your statutory mandate and the courts decide whether you're within the scope of your authority. Borlam actually concerned whether or not the Court of International Trade in that case could order the ITC to engage in the subsequent proceeding that the ITC didn't think it had itself authority to engage in. So the question really wasn't—that wasn't the question in Borlam. In that case, the court held that the ITC had too narrowly— But you're not arguing that we ought to allow the courts to themselves define their own limits of their power and receive deference for that, right? The courts. No, the agencies. We shouldn't allow the agencies to define the limits of their own power and then proceed to give deference. Well, when the matter—it's partly a question, as the Court has looked at it in cases like Sur America, has the matter been delegated to the—is the agency responsible for the administration of this kind of matter? If it's responsible for the administration of this kind of matter, it gets deference with respect to the scope of that authority. The way you articulated it just then seems to me to be internally inconsistent. I mean, if the question is a legal question for a court as to whether there has been a deferring to the agency with respect to the scope of the delegation, right? I mean, unless I misheard you— If I could go to the Bender case. Yes. In that case, the question was the delegation with respect to conduct before the office. And the question was whether conduct that was with the client in preparation to come into the office was before the office. The Court accorded the PTO deference with respect to its interpretation of before the office and said that its rules could properly reach that conduct, giving us Chevron deference with respect to that scope. But here it seems to me all of these are about proceedings before the office. They are not about, as in Merck, a proceeding before another agency. Even if we accept that, moving away from that issue, the question remains, and I think you alluded to this earlier, that what you've done still has to be in accordance with law. And my concern there goes to the 120 and the continuation issue. It seems to me, and tell me why, if you disagree, that 120 sets out quite clearly certain criteria for when an application is entitled to a priority date. And as I read your proposed regulations, they create a very explicit exception. In other words, they say an application except for the third or more application that doesn't involve new matter, you don't get the priority date. And that bumps up, in my view, to the language in the statute. First, that's not an accurate interpretation of the rule itself because additional continuations are permissible on a showing that, with reasonable diligence, one could not have brought the matter previously. Okay, so let's assume we're talking about a class of applications where you clearly could have brought the matter previously. I'm talking about that class. Understood. As the court held in the Boghazi case, 120 did not oust preexisting either judicial authority or the PTO's rulemaking authority to govern either prosecution latches of the court or the agency's ability to promulgate rules giving reasonable requirements and time deadlines. And clearly, all of the requirements with respect to filing are not set out in 120. So you're suggesting that Boghazi allows you to, as long as they're reasonable under some theory, even if they're completely inconsistent with the statute, Boghazi gives you free reign to... The statute was originally designed to codify practice as it existed at the PTO in 1952, which the PTO had developed along with the courts using inherent authority. And the practice at the time would not have contemplated... Well, that suggests then that they indeed made statutory the current practice. You need to go get a new statute, don't you? No, but the practice of that was... The statute says, shall have the same effect, shall have the same effect, whether it's the third, the fifth, or the first. As long as it's co-pending at the time they make the request. Understood, Your Honor. At the time, the practice would not have contemplated the uses to which that is now being put. For two clear reasons. One is that the Supreme Court president at the time said that if a two year delay in introducing amendments subjected an application to the risk of loss to the intervening rights. And second, it was not understood until at least 10 years after the 1952 act that a terminal disclaimer could be used to avoid a double patenting rejection. And so the practice was that the new application would be withdrawn. I'm sorry, I'm not understanding your point. So you think the PTO has authority to amend the law as the situation changes? I mean, you may be right in terms of the merits, but the question I think that Judge Rader was alluding to is who has the right, then, to change what the statute seems to clearly provide for? I mean, do you disagree that the statute is absolutely clear, that there's no exception or exclusion for third and fourth applications that do not provide anything that wasn't otherwise available? What the court held in the past... Can you just answer the question as to whether you think the statute is clear? No, Your Honor. What the court held in the Hendrickson case was that it was not clear on the face of the statute, unacutely clear on the face of the statute, that an applicant was limited to two continuations. And it therefore held that the board erred in finding that it was clear. And the court went to legislative history to say, well, there were a few cases where they had gone beyond that, so it's not clear. That doesn't mean that the statute is unequivocally contrary. But what we're faced with here is whether or not using its inherent authority, which was under Lay 120 and its explicit ability to govern the conduct of proceedings before the office, the agency can try to rebalance practice so that it more closely, implicitly not anywhere near coming back to what was intended to be codified in 120, more closely approximates what the original intention was. Looking at the other rule, the 525 rule, do you read 112 as the or more language as creating some kind of a limit? Well, or more only as court held in Rubenfield. Or more requires an applicant to submit at least one claim. Or more, does or more have a limit on it? Well- How many is or more? Well, I think that- Is six or more? Well, six is literally or more. Thank you. The agency, of course, has not here imposed a limit on the number of claims. It has only imposed a requirement that over a certain number of claims, the applicant should provide additional information to assist in the examination. So the PTO has not sought- Well, there's a little problem with that too. I'm not a- Wouldn't you be crazy to use that procedure and subject yourself to inequitable conduct if you make a slightly wrong comma in the wrong place? To the contrary, Your Honor. The first- To the contrary, you're going to go out and advise your clients to use the ESD procedure routinely? If the application calls for- You're advising a pharma company now and you've got clinical trials underway and you know you're going to need to, down the road, not only make additional- You're going to need continuations to cover your real invention. You're going to need more claims because you're not only claiming the species but the various formulations and the administration methods. You know the particularity of this. And you're going to say, well, it's okay. We can go beyond five and we can go beyond the continuation limit because, ah, we can clarify it all with ESDs. Well, first- That's the advice you're going to give your client. Your Honor, because the argument- That yes is your answer. The argument that is made- I bet you're not going to be hired by very many pharmaceutical companies. I think you've just sent yourself to the electronics industry. The argument that's made proves too much because the argument that's made is that inequitable conduct is charged in almost every case. So the marginal increase of the possibility of inequitable conduct charge in any given case is not great because it's always being brought. It would be great and they're very seldom successful. But you can see that the point of the question, which went too long, I apologize, is that you have shifted the burden here, that the Oetheker problem does come into case, that the burden's kind of shifted to you, not only to prove that you deserve the extra claims, but that you deserve the patent based on your own reading of the prior art, which if you mistake in the slightest, it's going to cost you your head. Well, in the Kingsdown case, Your Honor, the court quite properly noted, for example, that in transferring claims from- You've read our recent inequitable conduct cases. Oh, I've also read Kingsdown. And it properly noted that in shifting claims from one application to another, the possibility of inadvertent error arose, and the court should take that into account in looking at the intent element with respect to inequitable conduct. Insofar as there would be a concern with respect to the complexity of this, the court should do the same thing. Where the possibility of inadvertent error exists, that should be taken into account in looking at intent issues. This is not a situation where it's likely that significant intent elements will arise. I see my time is up. Can I- Before you sit down, let me move you on to another issue, which is the 132 RCE issue. Yes. You just have to clarify something for me. It seems your position, the Patent Office's position, is that A is not related to RCEs. Yes. But the argument, and everybody seems to agree, that B is. Yes. So the B provision. It's just not clear to me why an RCE wouldn't fall into the scope of the discussion of whenever an examination, any claim for patent is rejected. Well, the reason for that, if you look at RCE has a fee attached to it in B. Right. In normal patent prosecution, what happens is there's an examination, there's an objection, or a requirement, or a rejection. If there was a rejection, then there's an opportunity to come back from the applicant, and then it is reexamined. There's a second office action on the merits. That's the reexamination. And after that reexamination, is another, a further rejection? Assuming it's not allowed. So wouldn't that be, I mean, don't you read A is allowing for any number of those to keep going on and on and on? It's read to allow for two, the first and the second. There can be an after final practice. There may be certain circumstances where the second isn't declared final, but normally the second is declared final. The B comes in after that. I think my time is up. You will receive your full rebuttal time, Mr. Toupin. Mr. Damaris? Good morning, Your Honor. Thank you. May it please the Court, my name is John Damaris. I'm here for GSK. Counsel for Tafas and I have agreed to split our time, so I'll try to just use half of my time. Mr. Tafas will talk about the specifics of the rules and how they create conflicts, but I'd like to start about how we got where we are. I think if we take a step back and look at what happened here, it's perfectly clear that what the PTO is trying to do is that which this Court and its predecessor has told it repeatedly over decades it can't do. For instance, the PTO has repeatedly litigated before this Court's predecessor whether they can limit continuations. For instance, in Ingrid Henriksen, the CCPA told the PTO they can't limit the number of continuations. Later, in Ingrid Hogan, the CCPA said that Section 120 is clear and unambiguous. It says shall and shall mean shall. Could the PTO issue a rule that says applicants who file 12 continuations over an eight-year period without advancing prosecution when given the opportunity will forfeit their patent rights? This Court made it clear in the Prosecution Latches Trilogy, in Symbol 2, Ingrid Boghazi, and Symbol 4, that mechanical rules are not the way to handle this, and there's a reason for that. When you look at the history that has come before, the 1952 Act codified what was going on before. How about a rule like Judge Prost's rule with the proviso that the applicant is free to make a showing that there's a good reason for the sequence of continuations? What this Court said in the Prosecution Latches Trilogy is that mechanical rules are not to be used in this context because Section 120 is clear. The only ability to get out of— Her question and mine is no. It's a question— The facts of Boghazi, were they to come up in a rule setting, the PTO could not do it, but as long as they didn't make the mistake of codifying a rule, they could. The question is a matter of equity, and the Court or the PTO needs to take it up on an individual-by-individual basis. Equity is personal. You can't legislate mechanical rules to satisfy the rules of equity. Section 120 was enacted, and what came in with the 1952 Act is the equitable defenses of latches and estoppels. Those are personal. Those are not legislated by mechanical rules. So you're saying the Patent Office has the power to take certain action and informal adjudications, but it can't make a rule governing the use of that power? The Patent Office has inherent authority on an individual basis to take into account equitable considerations like this Court said in the Boghazi and Simbel cases. So they take them up individually, and they assess the circumstances, and they decide if equity, if the person has not advanced the prosecution, if it's been intentional delay, if they were not following the rules or essentially taking advantage of the statute, the Patent Office has that inherent authority, as this Court said in those cases. But to lay down a blanket mechanical rule for all applications is not equitable. Well, but they give you an out. They give you an out. They say, just explain your reasons or why you couldn't have done it earlier, and you can have more. Well, why you couldn't have done it earlier is not an issue. That's the problem with the current rules. They're saying now with the current rules, when you get to the third, you have to sign a declaration that says you cannot have done this earlier. That's not what 120 says. 120 says you shall get the date. The only way out of 120 is not whether you could have done it earlier, whether it's whether in the totality of the circumstances, you had violated the principles of equity. That's the only way out of section 120. Not by some mechanical rule that you should have done it earlier. Maybe there was a very good reason for why you didn't do it earlier. So is your view of the language in Borghese, which allows for reasonable requirements to be set by the Patent Office, can those be set and rule, or do they have to be done? Are you suggesting they can only be done by adjudication? It depends what kind of requirements we're talking about. If you're talking about requirements about how to go about filing a continuation, what are the mechanical steps to doing that, or what are the office processing steps, certainly they can do that. If they're talking about whether a continuation will be allowed on the merits, you're getting into substantive issues. And what the test is for whether it's substantive or not, and what they can't do is substantive. The test is, does it change the existing law or policy, and does it affect individual rights? So if their rule that they enact changes the existing law or policy relating to 120, and it affects the right to get that application, then no, they can't do it. If it doesn't change existing law and policy, and it's just about application processing, they can do it. It's pretty clear in this course. And why didn't Borghese, why didn't the rule in Borghese, they changed the rights of the parties, they changed, it changed existing law, no? In Borghese, the issue was whether, as an equitable matter, Borghese took advantage of the statute. When the 1952 Act came into being, equitable defenses survived. Latches and estoppels survived, but those are individual defenses. They're not blanket mechanical rules. So your position essentially with respect to Borghese is it was there all the time, we just found it recently. I'm sorry, I'm not sure I understand. The PTO and this court found the Borghese doctrine, but it was already there, laying... Prosecution latches and the equitable defenses were originally part of that. So there was no change for that reason? I think that there was no change in existing law with the Borghese symbol decisions, not at all. So what happened in the district court here, the PTO enacts these new rules, contrary to this court's precedent, contrary to the CCPA precedent, and they are, this is an attempt, let's make no mistake, for the PTO to come in where you told them they can't be, and to change the patent law. When you look at the APA section 706, it makes perfectly clear that a reviewing court shall set aside agency action that's not in accordance with the law or that's in excess of the agency's statutory authority. That's all the district court did here. What do you do with the factual predicate here? They're falling behind at least 100,000 applications a year. Something's got to happen. Yeah, something actually should happen, and that analysis and what should happen is something for Congress to deal with. When we look at what happened here, the PTO itself has no authority to change the law to address that problem. This court and Congress has been unanimous that the PTO doesn't have substantive authority. Congress, after this court's Merck decision, an animal legal defense case, where you decided the PTO has no substantive authority, after that, that was on section 6, after that, Congress enacted section 2, ratifying this court's decision that the PTO has no substantive rulemaking authority. And then that is now part of this statute. That is part of section 2. Congress's intent was made clear. So what has Congress been doing? Since 2005, Congress has been debating patent reform. They have been considering, should we give the PTO authority to mess with section 120? They have been debating, should we give the PTO substantive rulemaking authority? They debated it in 2005, 2006, 2007, 2008. It hasn't passed yet, but they know it's their job and they're attending to it. It's not for the PTO to say, we're tired of waiting for Congress and to come in, grab the law themselves, and start to change it. They can't do that. There's the DM case out of the D.C. Circuit, which I don't think you responded to because I don't think it came up until the Gray Brief. What is your view of the reasoning, if you're familiar with the case, the panel used in that case with respect to the differentiation of procedural and substantive? I think the procedural-substantive divide in this court over time has been clear, and you follow those Supreme Court cases on this. It's very easy. Does it change existing law or policy and does it affect individual rights? There has been some discussion about, I don't know if you're talking about the stamp of approval. Is that the one you're talking about? The JEM case, the one about the rules for FCC filing. The JEM case, that's to get the licenses. Yeah, that has nothing to do with the circumstances. Here, in all of those licensing cases, the applicants are trying to get a license. They don't have a statutory right to a patented idea, which is what we're talking about here. In the licensing cases, the agency has the ability to set the criteria for you to apply for a license, and then if you follow the criteria, you get a government benefit, which is the license. In the patent context, it's totally different. Those cases have no applicability. In the patent context, when I invent, I already own the idea. It's my invention. I am going to the government not to get a government benefit. I'm going to the government and giving up my trade secret, and the quid pro quo is they owe me a patent. It's not a question of they're benefiting me, like in the licensing context. If I've invented something and I was the first, the government owes me a patent for my exchange and my trade secret, so those cases are all entirely distinguishable. When you look at the clear history here in this court, if a rule is substantive, if it changes existing law and policy, and if it affects individual rights, that has been uniformly experienced. But on one level, you can see this as falling right within their 2B2 authority to expedite processing of patent applications. We can talk about that. What happened here, the history here is very important because they want to talk about Chevron deference for the scope of their authority. Let's talk about that for a minute because this court, as I said, decided Merck and Animal Legal Defense under Section 6 and unequivocally said they have no substantive authority, just procedural authority. After that, Section 2 was enacted using exactly the same language. Congress ratified this court's divide between substantive and procedural. How would you say that? So when the back office comes in and says, I'm sorry, Arnie. No, go ahead. When the back office comes in and says, we're going to read Section 2 expansively and say that we have actually a little bit of substantive authority, even if we gave them Chevron deference for that reading, they fail at Chevron Step 1 because Chevron Step 1 says if Congress has spoken, you have to live by Congress's interpretation. When Congress enacted Section 2, it ratified your decision that there's a divide between substantive and procedural and Section 2 doesn't cover it. On the procedural and substantive scale and with the definition that you've adopted, where do you put Cooper against Dudas? Cooper against Dudas was on the procedural side. And why? Well, of course, that's what we said. But why do you think, do you agree that that was correct? And if so, how does that square you? I do agree it was direct and it's very different from this particular. What was going on in the Cooper case was the interpretation of the, was it original application language that there wasn't prior case law, there wasn't decades of case law. Congress hadn't amplified what that terminology meant in any sort of meaningful sense. When the Patent Office came in and gave their spin on what that phrase meant, the way that the procedural, substantive, interpretive divide works is that would be considered, in my view, an interpretive rule, which is not substantive. Well, interpretive can be, and typically is, have very substantive impact. I mean, if I am the Labor Department and I interpret the meaning of employee, I've just made a very important substantive determination, right? Exactly. And the difference between that and what we have here is, and Cooper and the other cases is, if you're doing it with a brand new statute that hasn't been clarified by Congress, that doesn't have decades of decisional law, it could be considered interpretive, but when you're- It's procedural if the agency does it first, but then it becomes substantive if the agency does it after the court is- The test is very simple for substantive. Does it change existing law or policy and does it affect individual rights? In the Cooper case, when they're interpreting that phrase, they were not changing existing law or policy. There weren't cases out there that have interpreted Congress- So if these regulations had been issued in 1953 before there was any case law under the 52 Act, then they would have been procedural, but now they're substantive? In this particular case, no, because what the 52 Act did was codify then existing law. Remember, continuations, claims, and these issues, these didn't come up in the 1952 Act. The Supreme Court decided these issues in the 1800s. So you've got the Supreme Court cases, then you've got the early patent acts. All of this was in there in the decisional law. The 1952 Act then came in and they codified where we were at that time and now we've moved forward. So even if the patent office had interpreted these in 1953, they would have been changing the existing law of the 1952 Act, which had been established decades before. You represent GlaxoSmithKline. Yes, sir. Is there substantive merit to my hypothetical that a pharmaceutical company could well need substantively claims beyond a two limit on continuations and beyond a limit of five independent claims and 25 total? In my view, and I've been working for the pharmaceutical industry for my entire career, happen to be a chemical engineer by training. You will, in my view, cripple the pharmaceutical industry with these rules. That's why we moved this case. That's why we asked for preliminary injunction. What the pharmaceutical industry does... The crippling effect being what? The problem for the pharmaceutical industry and why these rules are so problematic is they come up with a class of compounds, which is a big genus of compounds. That's what they invent in the laboratory. It then takes them literally a decade, literally a decade and billions of dollars to find the species that works. Many of them fail along the way. They go into clinicals, phase one, phase two, whatever, and they may put in 100 million or 200 million or 300 million dollars and it may fail in the clinic. They got to go back and pick another one and try again. If you limit them to two continuations and the third only if they could have done it early, you're going to cripple them because they're going to get into the process, multi-years into the process, hundreds of millions of dollars into the process, and then they're going to find the compound that actually works and saves human lives and they're not going to be able to patent it. And you know what happens if they can't patent it? They're not going to take it to market because if they're going to take it to market and everybody could copy it, they're never going to recoup their investment. So they're going to go back and find it. And why do you need so many more claims? Because you're claiming formulations and methods of administration... Well, there's a whole bunch of reasons. Those and crystallization factors and everything else, right? There's a whole bunch of reasons. Those, but even more than that, even just to get the species might take a manner of continuation because you're going to start with a bunch of the species and they may not work and then you're going to... 25 claims is nothing to the pharmaceutical industry. When you think about the scope of what they're inventing with you've got the first compound, then you've got the genus, then you've got the compound, then you've got the formulation, then you've got the dosage. When you start going through all the things they need to get a product to market to protect their billion-dollar investment, they need a lot more than 25 claims. And there is no allegation in this case that GSK is abusing the system or doing anything that any other pharmaceutical company isn't doing and that they need critically for their business. So I think getting back to the beginning where we were, I think this is an attempt by the PTO to come in and change existing law that was established by the Supreme Court in the 1800s and following on only codified in the 52 Act because they're tired of waiting for Congress to act. And even if you gave them deference, you don't need to get to the Chevron deference issue because you can decide this on the two prongs the district court did, which is these rules are substantive because they change existing law and policy and they affect important rights. And that is a violation of Section 706 of the APA. So you never need to get to the Chevron issue. But even if you do, if you get to Chevron on both prongs, one is do they have Chevron for the scope of their authority? Give it to them. They fail on prong one of the Chevron test. Prong one says if Congress spoke, you can't go further. Section two ratified your holding in animal legal defense, which says they don't get substantive authority. Go on to Chevron for the merits. You give them Chevron for the merits, they fail yours on. Mr. Demarest, we probably better hear from Mr. Moore. Yes, it's time for me to move on. Can I just make two quick points before I leave, Your Honor? Please. In our brief, we had two other independent grounds to sustain the district court. I just want to mention them so they don't go unmentioned. One is retroactivity. These rules are clearly retroactive. The whole point of them was to get rid of the 700,000 plus pending applications. And for that reason alone, you can void these rules. And the second point I wanted to mention is on this ESD, which Your Honor brought about with the PTO's argument. The ESD is hopelessly vague. When you look at that regulation, it tells you if you read that regulation literally, you have to search the world in a patent hunt to get past 25 claims. They want you to search patents, patent documents, literature, libraries around the world. And then when you look and ask them, how do I know when I've searched enough or if I've searched enough? They tell you there's no limit on the cost and we're not going to tell you where to search and when to end the search. And then in the district court below, the Patent Office submitted a declaration to try to defend the ESD. And if you look at that declaration, which is in the appendix at A1092, it's more vague than the ESD rule. It doesn't tell you which libraries, where around the world, what cost, or when to stop searching. Thank you, Mr. Mears. I think we have those points. Thank you, Your Honor. Mr. Moore. Can you please put eight minutes down for Mr. Moore? May it please the courts, Steve Moore for Dr. Taffas. Dr. Taffas is an entrepreneur who's owned a number of businesses and is the original one to bring the complaint against the USPTO. What I'd like to talk today about is 2B2. That's what we're all talking about. 2B2 only allows the USPTO to establish regulations provided they are both inconsistent with the law and they provided the regulations are procedural rules. And actually it's procedural rules related to the processing of patent applications and the conduct of practitioners before it. These rules are both inconsistent and substantive. We've talked a lot about the substantive aspects, but we haven't talked that much on how they are inconsistent. They're inconsistent as we stated in terms of these rules cause for certain continuations and RCEs that they will not be allowed unless the amendment argument or evidence thereof could not have been previously submitted. This abrogates the rights under the statutes of 120 and 132, which make it very clear that you have certain rights in terms of priority. They also have an impact in 78F2, which is something we haven't discussed. This triggers a presumption of double patenting if you have the same inventor, same owner, and you have one or more priority dates that are the same. It's an automatic presumption of double patenting. The way it is written right now in the regs, it actually violates 121. 121 was specifically passed to keep the patent office from instituting a double patenting rejection in light of divisional applications that were filed pursuant to a restriction requirement. This presumption automatically occurs even irrespective of the fact that this is now one of these divisionals. It also violates 133 in the terms of it gives you 30 days to respond to a USPTO rejection. The presumption occurs immediately, no 30 days to get back. It also changes what used to be a substantive failure to a procedural failure, now making actions challenging a double patenting rejection reviewable only under the abuse of discretion standard of the Administrative Procedure Act. This violates both sections 141 and 145 by divesting the court and the board of their statutory jurisdiction to review double patenting rejections de novo. The 525 rules. Besides 112 paragraph 2, which we discussed in terms of the case law of this court has said that you have the right to express your invention in one or more claims and that you get to determine the necessary number of scope of these claims in Ray Wakefield and Ray Clark. We also have a violation of 131 in that, take this for an example, you have more than 525. Do you think, let me interrupt you if I could, do you think that if someone came in with a thousand claims and said to the examiner, get busy, you've got a lot of claims here, but you know, do you think the examiner could say or that the PTO could say as a policy matter, no, that's just too many claims. There's no way that you need a thousand claims. We're just not going to look at a thousand claims. Under the rule, under the law today, no, they could not say that. And they couldn't devise a rule that would say that. But we do know what they do. I mean, we all know what they do. They will restrict those thousand to a thousand applications. Well, but... I mean, in practice, that's reality. Okay, but you think that's perfectly permissible? As long as you're going to pay those fees for the thousand claims. Would they ask you to pay extra fee beyond, if you want... More than 25 claims. If you want more than 25 claims, could they double the triple or quadruple the fee? I have advocated for a long time that the patent office should get the statutory right to do that. I think that's the way of resolving the problem. They haven't as... Would that be substantive? Would that fall afoul of the statute? It would, unless they were unduly multiplied. And we do know that. That's from the case law. What does that mean? Yeah. Is if you're just basically saying the same thing over and over and over again. I mean, the claim is not really different from one claim to the next. Then it would be unduly multiplied and you could do something. But if you, per chance, as I have seen, not that I advocate this in any manner, nor have I ever advocated or have ever filed a patent application, with a thousand or even a hundred claims, you will see some patent specifications that were huge. It is possible that you actually have a thousand embodiments in there. I don't advocate it. The patent office clearly has now promulgated it. The page limits is too high that, you know, you have to pay a much higher fee. They got that... And you think that's okay. Oh, but that, I guess, is... Yeah, all right. That's good. But if they were to do that by rule, would that be a procedural rule that would be permissible? Under the current statutes, the fees are set by Congress. So I don't think that they can set fees. They have never believed they could set fees. I don't believe they can set fees. And they certainly have looked for the statutory right to be able to do that. In terms of the substantive rights, well, first of all, 120, we automatically make prior art under 102 something that never was prior art. It could be my own application now. If I need to file another continuation, they're going to take my third continuation. You understand that. What they're going to do, though, is now take my original application and make it prior art against me. So that's clearly substantive. If no ESD was filed and there's more than 525 claims are desired and there's no restriction requirement given, suddenly now I'm forced to file my continuations in seriatim. Clearly, that's going to affect how much patent term I get at the end. That's 154. Now, we did a great deal of talk about the whole issue of shifting of burdens. You have a shifting of burden in patenting and that the patent office no longer has to make out this prima facie case of double patenting. You have a shifting of the burden under 102, 103, 131, and now requiring the applicant to file an EFD if it's seeking more than 5 or 25 claims. That ESD is not anything minor. In fact, it didn't take more than a few weeks before the practitioners started calling it the express suicide document. That is an opinion of counsel that we are now handing over to the whole world. We've just waived our right to attorney-client privilege. I'm going to hand that opinion over. I've put in the possibility of an equitable conduct, which the patent office itself or the offices of the patent office have said they know nobody's going to do. Thank you. Thank you, Mr. Moore. Would you add 10 minutes to Mr. Tupin's time? That will account for the extra eight we gave Mr. Moore and the little time we ran over with Mr. DeMaris. So should you need to use it, you have... He's computing. Thirteen minutes. Thirteen minutes. That's what I thought, too. I'll try to be short.   I'll try to be short. I'll try to be short. With respect to the standard, this court has used the changed existing law or policy affecting individual rights standards only to distinguish substantive from interpretive rules under the APA. It has never done so to distinguish substantive from procedural rules. And on that issue, we believe that the JEM guidance is appropriate because otherwise an agency could set procedural rules but then could never change them, which can't be the law. In addition, with respect to what Congress said about our ability to do substantive rulemaking, under Section 3 of the Act in 1999, it provided that where the PTO was promulgating patent or trademark rules as to which notice and comment would be required under the APA, that is to say substantive, it was required to consult with its public advisory committees. Congress clearly contemplated that our rules would be substantive, could be substantive within the APA. So the premise of their statutory argument is simply incorrect. Mr. Tupin, I know we're straying a little into policy here rather than direct law, but Mr. DeMaris made the point that this could be crippling for the pharmaceutical industry. Was that considered as part of the notice and comment period and was that considered by the office in doing this in the first place? Absolutely, Your Honor. Our original proposal was one continuation or RCE as of right and any additional would require a showing. We changed that explicitly in response to concerns about the effect on commercialization to 2 plus 1. Now, if you look at, if you take into account the ability as the pharmaceutical industry usually does to use PCT and delay substantive examination for 30 months or use our deferred examination rule and the normal time to decision on initial applications and simply the 1444 timeframes in statute, a typical 2 plus 1 process will take 10 years. And afford the ability to develop that the pharmaceutical industry is concerned with. In fact, in the joint appendix at A1555, GSK's affiant talks about an application with one RCE taking seven years. So the time it takes to develop remains there. Now, where the PTO differed from the pharmaceutical industry was the pharmaceutical industry was saying, we only want to come to you when we're through clinical trials. Well, what the PTO was saying was, well, that's not the standard for when you're ready to go to FDA and get safe and effective approval. It's not the same standard for when you've established a sufficient utility and maybe unexpected results to come to the PTO. It's that standard that we want you to look for in terms of whether you are ready to distinctly point out and claim your invention. But the proceeding without any showing takes the amount of time they say they need. And the PTO took that specifically into account in changing from its initial proposal. Let me turn to, in your brief, you talk about the comments that were made in response to the comments by the PTO and its rules. And so you sort of put a gloss over whatever these rules are. You say they're not a hard limit. You say they're not categorical. And then you tell us we will have to defer to that because that's your interpretation of your own rules. I'm just wondering on how we are supposed to evaluate rules that have this sort of gloss in them. Are we supposed to read the rule and say, but even though it sounds like a hard limit, it's not a hard limit because the PTO has told us that it's not going to apply it categorically as a hard limit. What are we to make of that? Well, first, if you look at the joint appendix, I think the discussion is at A107 to about 112. We go through a number of examples. So we give, for example, where a applicant has been engaging in experimentation to establish utility, to establish unexpected results, and it's just now becoming necessary. That's one where we will be granting the petition. If there is an unexpected rejection in the last office action that couldn't have been anticipated, that will be granted. We give- So all you're giving are examples of what the rule is because the rule does allow for exceptions, but it's not sort of removing a hard limit. I'm not clear on- Well, when it does, it sets a benchmark. The benchmark would only be a hard limit if there weren't exceptions to it. So I may not be understanding- If you're defining what you're doing, then you're defining what the exceptions are. Well, we're defining the basis for the granting of a petition. What we're saying, though, is if what you're wanting another one for is something that is handleable by an appeal or by a petition, then use the other procedure before the office that's available to you. That's part of governing the conduct of proceedings before the office. A question just kind of occurred to me, a little off track, but if an applicant uses delayed examination, as you just said they could, how would that affect patent term restoration under the Hatch-Waxman Act? I don't know the answer, Your Honor. Go ahead. With respect to the double patenting, which was raised by TAFAS counsel, what happens if you don't file your rebuttal to the double patenting presumption is you'll get a requirement to file. The standard to be applied by the examiner remains the same. The examiner still bears the burden, and if wrong on appeal to the board didn't establish the grounds, they would lose. So what the commenters told us in response to the possibility of an ESD above a certain number of claims is that they just split claims among a whole bunch of different applications and avoid the whole problem. That then required us to say, then tell us why these are different. And that's basically all we've done. With respect to the vagueness issue, first, these are not an independent basis that have been raised by GSK for upholding the judgment below, which enjoins the entire rule, so they are not properly before the court. But if you simply take their own cases, the General Electric case, which they cite on vagueness, which says that in response to it, whether or not the vagueness doctrine applies to regulations depends upon the consequence of vagueness. And in that case, they said the only consequence of vagueness is in order to comply with a clarified instruction. That doesn't render the rule vague. That's exactly what would happen here. That is to say, if an ESD were insufficient, there would be a requirement which would state the basis for the insufficiency and an opportunity to cure the insufficiency. So there's no forfeiture if they don't get it right. But in fact, the office has issued ample guidelines, including its own MPEP, as how it tells examiners to search, which give very detailed direction with respect to how to comply. It's not open-ended. You do have to cover each of the statutory kinds of things that would be relevant to an application, which would only be what would occur if we had, as to these matters, a Rule 11 requirement to engage in reasonable inquiry before filing. In fact, we do have such a requirement under our Rule 11.18. The only reason that it's limited with respect to the filing of patent applications is our Rule 56, which limits what they currently need to research to what they already happen to know about. But turning to Rule 56 very briefly with respect to their... I'm sorry, Your Honor, you were... Yeah, I did have a question. Mr. Damaris made the point that 2B2 is somehow linked to the Federal Circuit's case law and kind of limits the interpretation that you can give to some of those terms. What their argument is, Your Honor, is that because Congress added the provision our rulemaking must comply with the APA, therefore all of our rulemakings must be done by notice and comment, and therefore none of our rulemakings are substantive. Well, wrong on all scores. As the scores held, the reference to the APA includes its exceptions. So we can both do rulemakings that require notice and comment, which is clear in Section 3, and those that don't. I think, Your Honor, unless you're honest with me... Could you spend a moment on the retroactivity issue? Yes, Your Honor. First, retroactivity does not apply to any of these matters. As the Court stated... Well, you mean the doctrine of retroactivity? The doctrine of retroactivity does not apply. The rules are, at least in some respects, retroactive. They apply to pending applications. But in all cases, there is an opportunity to adjust to the requirement before it fits in. Well, that's when I started to get a little unsure of exactly how this works. With respect to continuations, for example, however many continuations one may have engaged on in a family before the effective date, there will be an automatic opportunity for another one. With respect to the claims rule, it will not apply to any rule as to which... any application as to which there's already an action. If there isn't an action, there will be an opportunity either to file the ESD or to change the number of claims in the application. So in all contexts, there is an ability to adjust and no previously completed transaction will be rendered in any way violative by operation of the rule. Thank you, Your Honor. Thank you, Mr. Tupin. The Court appreciates the arguments. All rise. The Honorable Court is adjourned.